UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JACK IN THE BOX INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>DEEPAK MEHTA, et al.,<br><br>        Defendants. | Case No. 5:13-cv-04444-EJD<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 205 |

This action is one between a franchisor and its former franchisees. Plaintiff Jack in the Box, Inc. ("JIB"), a corporation engaged in the "highly-competitive quick-service restaurant business" alleges that Defendants Deepak Mehta ("D. Mehta"), Kiran Mehta ("K. Mehta"), Mehta Enterprises, Inc. and Deepak Enterprises, Inc. (collectively, "Defendants") breached several provisions of the written agreements that enabled Defendants to operate Jack in the Box restaurants throughout Northern California.

Presently before the court is JIB's Motion for Summary Judgment and for Partial Summary Judgment on its first, third and fourth causes of action for breach of contract and violations of the Lanham Act, 15 U.S.C. 1051 et seq., as asserted in its First Amended Complaint. Dkt. No. 205. JIB also moves for summary judgment on Defendants' counterclaim for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and negligent interference with contract and economic advantage. Defendants have filed written opposition to the motion. Dkt. Nos. 215, 216.

Having carefully considered this matter, the court finds that JIB is entitled to partial

1  summary judgment on its cause of action for breach of contract, is entitled to summary judgment
2  on its causes of action for trademark infringement and unfair competition, and is entitled to
3  summary judgment on Defendants' counterclaim. Accordingly, JIB's motion will be granted in its
4  entirety for the reasons explained below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Franchise Agreements

The details of JIB's relationship with Defendants were primarily outlined in 19 written Jack in the Box Restaurant Franchise Agreements, which the parties executed between September 22, 1992, and May 19, 2011. Decl. of Connie Rand ("Rand Decl."), Dkt. No. 205, at ¶¶ 5-7, Exs. 1-3. Although JIB initially entered into the agreements with D. Mehta and K. Mehta, the parties subsequently agreed to assign the rights of those individuals to Mehta Enterprises, Inc. and Deepak Enterprises, Inc. Id. at Exs. 2, 3. Thus, all Defendants became jointly and severally liable for the performance of the agreements' terms and conditions. Id.

Generally, the Franchise Agreements authorized Defendants to utilize JIB's commercial marks, format and restaurant operating system in exchange for Defendants' monthly payment of royalty and marketing fees. Id. at Ex. 1, § 1. They also obligated Defendants to, among other duties, maintain and submit certain records to JIB, pay all state and federal taxes associated with operation of the restaurants, and to "comply and perform all covenants contained in any other agreement, instrument or other document" between JIB and Defendants, including any other franchise agreement, lease agreement or note. Id. at Ex. 1, §§ 7, 8, 16.

In addition, the Franchise Agreements contained a termination clause. Id. at Ex. 1, § 17. Defendants would "be deemed to be in default . . . and all rights granted [would] immediately terminate automatically and without notice" if Defendants became "insolvent" such that they failed or were unable to pay obligations in the regular course of business as they became due." Id. Additionally, upon the occurrence of other "default" events, JIB could terminate the Franchise Agreements at its option. Id. The following occurrences could permit termination:

> Franchisee fails for a period of ten (10) days to pay any of the fees required under this Agreement;
>
> Franchisee fails to pay any federal or state income, sales or other taxes due on the Restaurant's operations . . . . Franchisee will have five (5) days to correct such condition.
>
> Franchisee fails to make regular payments to JIB or any Vendor for any monies due and owing. Franchisee will have thirty (30) days to correct such condition.
>
> Franchisee fails to comply with any other provision of this Agreement or defaults under any other franchise agreement, development agreement, lease agreement, note, or any agreement or account for the purchase of products or services between JIB and Franchisee, whether or not pertaining to the premises. Franchisee will have thirty (30) days to correct such condition.

Id.

Other provisions specified the Franchise Agreements were fully integrated contracts, and could only be modified by a signed writing. Id. at Ex 1, § 19.

### B. The Lease Agreements

Defendants, as tenants, and JIB, as landlord, also entered into Lease Agreements in connection with the Franchise Agreements. Id. at Ex. 4. The Lease Agreements required Defendants to pay a fixed amount of monthly rent, along with an additional amount of rent based on the percentage of gross sales, in exchange for Defendants' use of the property for the operation of franchised restaurants. Id. at Ex. 4, § 3. The lease agreements also required Defendants to pay any taxes levied against the property, to make all utility payments, to maintain and pay for insurance coverage, and prohibited Defendants from encumbering the property. Id. at Ex. 4, §§ 6, 7, 9, 21.

The Lease Agreements could be terminated by JIB if Defendants failed to pay rent within 5 days of a demand to cure, or if Defendants defaulted on the Franchise Agreement or any other "lease, note, or other agreement" between JIB and Defendants. Id. at Ex. 4, § 23.

### C. Defendants' Defaults under the Agreements

Between September 1, 2011, and August 22, 2012, Defendants failed to pay rent, royalties,

marketing fees and other charges due to JIB under the Franchise and Lease Agreements in the total amount of $567,092.45. Decl. of Keith Guilbault ("Guilbault Decl."), Dkt. No. 205, at ¶ 5-7, Exs. 1, 3; Rand Decl., at ¶ 11, Ex. 7. The parties eventually attended a mediation to address these defaults, which resulted in a written Promissory Note (the "2012 Note") in the amount of $576,173 payable to JIB, as well as a General Release. Rand Decl., at ¶ 13, Exs. 9, 10. D. and K. Mehta signed both documents on November 28, 2012. Id. By doing so, they agreed to remit to JIB an expected rebate from the Coca-Cola Company within 7 days of receiving it, and to pay off the 2012 Note by April 15, 2013. Id. Through the General Release, they agreed to discharge JIB from any liability arising out of any matters prior to November 28, 2012. Id.

However, not addressed by the 2012 Note were two notices of lien recorded on September 11, 2012, by the Contra Costa County Tax Collector against Defendants' personal and real property for failure to pay property taxes. Decl. of Robert S. McWhorter ("McWhorter Decl.), Dkt. No. 205, at ¶ 3, Ex. 3.[1] Neither was a UCC Financing Statement that was recorded against Defendants' personal property by MGI Group, LLC on October 23, 2012. Id. at Ex. 10. Thereafter, the California State Board of Equalization also recorded liens against Defendants on February 5, 2013 and March 5, 2013, for unpaid sales tax in the total amount of $648,400.10. Id. at Exs. 1, 2. Additionally, Coca-Cola notified Defendants that it was mailing a rebate to them on February 23, 2013, but Defendants failed to pay the rebate to JIB pursuant to the 2012 Note. Decl. of Shane Paul ("Paul Decl."), Dkt. No. 205, at ¶ 9, Ex. 4.

Beginning on March 27, 2013, JIB served several Notices of Default upon Defendants, and eventually extended the date on which most of the Franchise and Lease Agreements would terminate to September 17, 2013. Rand Decl., at Exs. 12-24. The agreements for one store, No. 578, were scheduled to terminate on September 5, 2013. Id. at Ex. 25. The Notice of Default dated August 16, 2013, informed Defendants they owed $1,993,415.15 to JIB as of August 15, 2013. Id. at Ex. 23.

---

[1] JIB's request for judicial notice is GRANTED. Fed. R. Evid. § 201.

4
Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

### D. Defendants' Efforts to Obtain Financing and Termination of the Agreements

In May, 2013, Defendants began working with Bank of America about refinancing existing debt. Decl. of Anna-Marie E. Mundle ("Mundle Decl."), Dkt. No. 205, at ¶ 3. On July 13, 2013, Bank of America issued a conditional Commitment Letter to Defendants for a loan of $7.8 million, with contained a representation that Defendants would sell 5 restaurants and use the proceeds to pay any outstanding debt owed to JIB. Id. at ¶ 4, Ex. 2. Defendants did not, however, initially notify Bank of America of their defaults under the Franchise and Lease Agreements. Id.; McWhorter Decl., at Ex. 13, 75:4-8, 12:15-20, 122:14-123:2.

On July 17, 2013,[2] Steven Brigandi of JIB sent a "good standing letter" to Bank of America which stated that Defendants were in default under their agreements with JIB. Mundle Decl., at Ex. 3. Brigandi further stated that JIB "believed" the default would be "cured from the proceeds of the sale of five restaurants to another existing Jack in the Box franchisee, in conjunction with the proposed refinancing." Id. Bank of America learned for the first time through Brigandi's letter that Defendants were in default. Id. at ¶ 7; McWhorter Decl., at Ex. 13, 122:14-25. D. Mehta represented to Bank of America he owed $800,000 to JIB. Mundle Decl., at ¶ 11, Ex. 7; McWhorter Decl., at Ex. 13, 126:10-127:11.

On September 10, 2013, D. Mehta emailed Elana Hobson of JIB requesting that JIB issue a payoff letter to Bank of America for $1 million. Decl. of Elana Hobson ("Hobson Decl."), Dkt. No. 205, at ¶ 5, Ex. 4. Two days later, he emailed Hobson and Shane Paul of JIB requesting a payoff letter for $800,000. Id. at ¶ 6, Ex. 5. On September 12, 2013, JIB emailed a payoff demand to Bank of America for $2,379,319.78, but noting that Defendants had since wired $100,000 to JIB. Mundle Decl., at Ex. 6.

Ultimately, Bank of America notified Defendants it was "unwilling to move forward to closing given the substantial difference in the amount due Jack in the Box over that previously disclosed" by D. Mehta. Id. at Ex. 10. JIB terminated the Franchise and Lease Agreements

---

[2] Although the letter itself is dated October 17, 2013, it was attached to an email sent by Brigandi to Geoffrey Berg at Bank of America on July 17, 2013.

5
Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

effective 12:01 a.m. on September 17, 2013, because Defendants had not cured the default. Paul Decl., at ¶ 11.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. Id. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. Id. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." Id.

**III.     DISCUSSION**

   **A.     Breach of Contract**

JIB moves for partial summary judgment on its first cause of action for breach of contract. Because JIB would bear the evidentiary burden at trial, it "must persuade the court that there is no genuine issue of material fact" on each element of the claim. Id.

In California, "[t]he standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" Wall St. Network, Ltd. v. New York Times Co., 164 Cal. App. 4th 1171, 1178 (2008) (quoting Regan Roofing Co. v. Super. Ct., 24 Cal. App. 4th 425, 434-35 (1994)).

   **i.     Existence of a Contract and JIB's Performance**

JIB has met its burden to establish the first two elements of breach of contract. As to the existence of a contract, Defendants concede that several contracts existed between the parties in the form of the Franchise and Lease Agreements.

With regard to JIB's performance, the record supports the conclusion that JIB satisfied the obligations actually required by the Franchise and Lease Agreements such that Defendants were permitted use of JIB's commercial marks, format, restaurant operating system, and real property. Paul Decl., at ¶¶ 14, 15. Defendants do not dispute that fact.

Instead, Defendants focus on other matters to claim that JIB improperly terminated the agreements in September, 2013. They argue that JIB neglected to provide them monthly invoices from June, 2013, through September, 2013, despite a 20-year history of doing so, and that JIB's

7

Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

failure to deliver these invoices resulted in "discrepancies as to actually monies owed." They also claim that JIB refused to provide an accounting of the $2.3 million demand it made to Bank of America and interfered with a "cure deal." But these alleged instances of non-performance are not supported by evidence which raises a genuinely disputed fact as to this element. Indeed, Defendants have not identified contractual provisions requiring JIB to issue monthly invoices to Defendants, to provide a post-default accounting, or to participate in a "cure deal." See Brown v. Grimes, 192 Cal. App. 4th 265, 277 (2011) (holding that only when "a party's failure to perform a *contractual* obligation constitutes a material breach of the contract" is the other party "discharged from its duty to perform under the contract."). Without such evidence, a reasonable jury could not find that Defendants were discharged from fulfilling their own contractual obligations because JIB first failed to perform. See Matsushita Elec. Indus. Co., 475 U.S. at 587 ("[T]he issue of fact must be 'genuine.'"); see also Anderson, 477 U.S. at 249-50 (holding that a genuine issue for trial is not created by evidence "not significantly probative" or that is "merely colorable").

Similarly, Defendants did not submit evidence establishing their claim that JIB was obligated to provide them 15 days to fulfill the $2.3 million payoff demand it made to Bank of America, or was required and failed to wait 30 days from Defendants' "last regular payment" before terminating the agreements. To the extent Defendants rely on section 17(C)(10) of the Franchise Agreements to support a 30-day pre-termination waiting period, such evidence does not create a genuine dispute of material fact on the issue of JIB's performance because Defendants did not produce evidence to show they made a regular payment according to the terms of the Franchise Agreement less than 30 days before termination.

In any event, and as will be discussed in more detail, JIB has shown that Defendants breached the agreements in several ways, some of which permit termination within a much shorter timeframe. For example, the Franchise Agreements specify that a failure to pay federal or state taxes must be corrected within five days to preclude a default and potential termination of the agreement by JIB. Rand Decl., at Ex 1, § 17(C)(7). As such, any failure to observe a 30-day

waiting period is immaterial.

Nor do these circumstances require an examination of parol evidence in order to define JIB's obligations under the Franchise or Lease Agreements. In their opposition, Defendants suggest the existence of a latent ambiguity or a need to consider the parties' course of dealing. Defendants, however, have not presented a complete argument on this topic because left unidentified is what provision of which agreement is ambiguous, or what particular evidence should be admitted. Notably, K. Mehta's statements concerning the provision of monthly invoices cannot be properly admitted as course of dealing evidence because they do not prove a meaning to which the agreements are reasonably susceptible; as previously indicated, no provision of the Franchise or Lease Agreements obligated JIB to submit monthly invoices to Defendants or could be interpreted to require such invoices. See Winet v. Price, 4 Cal. App. 4th 1159, 1165 (1992) ("The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.'"); see also Powers v. Dickson, Carlson & Campillo, 54 Cal. App. 4th 1102, 1111 (1997) ("Parol evidence cannot . . . be admitted to show intention independent of an unambiguous written instrument."). In the absence of a viable argument supported by qualifying parol evidence, an analysis of whether the contract language is reasonably susceptible to some alternative interpretation is without purpose.

Furthermore, Defendants cannot use K. Mehta's statements to impart additional, implied contractual terms rendering payments to JIB contingent on the receipt of an invoice. Even if it is true that JIB provided Defendants with invoices for 20 years, Defendants could not have been induced into believing that payment was not due unless they received an invoice because the Franchise and Lease Agreements specifically designate when payments should be made. Rand Decl., at Exs. 1, § 7; 4, § 3. Consequently, Defendants' implied argument based on Wagner v. Glendale Adventist Medical Center, 216 Cal. App. 3d 1379 (1989), is unpersuasive because they have not shown that JIB's alleged conduct was "antithetical" to any payment term of the Franchise

9

Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

or Lease Agreements.

Finally, the record does not support Defendants' contention that JIB breached the Franchise and Lease Agreements by failing to observe a "cure agreement" or, as they phrase it, the "Cure Deal." According to K. Mehta, Brigandi agreed that Defendants could cure all defaults "through a bank refinance and the sale of at least five . . . stores," and Hobson "also promised and reassured [them] from June 2013 through September 2013 that as long as [they] actively worked to close the Cure Deal as soon as [they] could, JIB would not terminate [their] Franchise Agreements." Decl. of K. Mehta, Dkt. No. 215, at ¶ 53. But the only evidence Defendants cite to in support of the "Cure Deal" is the "good standing letter" from Brigandi to Bank of America and deposition testimony from Hobson, neither of which establishes the cure terms described by K. Mehta. In his letter, Brigandi wrote that JIB believed Defendants' default would be cured by the sale of restaurants "in conjunction with" the proposed refinancing. Mundle Decl., at Ex. 3. Brigandi did not write that JIB has reached an agreement with Defendants not to terminate the Franchise Agreements. Likewise, Hobson did not testify that JIB would refrain from terminating the Franchise Agreements on any certain terms. Rather, Hobson stated that JIB did not immediately terminate the agreements so as to allow Defendants a period of time to possibly obtain financing and "get caught up." Decl. of Al Mohajerian, Dkt. No. 216, at Exs. U, MMM, NNN.

Although the court must draw all reasonable inferences in Defendants favor, the speculative evidence of a "Cure Deal" would not permit a reasonable jury to find that JIB either agreed to modify the written provisions of the parties' contracts to provide for a cure, expressly or impliedly waived any right to terminate, or entered into some separate cure agreement with Defendants. See Cal. Civ. Code § 1698 (providing that a written contract cannot be modified by an oral agreement if "the contract otherwise expressly provides"); see also Old Republic Ins. Co. v. FSR Brokerage, Inc., 80 Cal. App. 4th 666, 678 (2000) (holding the proponent of the waiver of a contractual right must be prove it by clear and convincing evidence "that does not leave the

matter to speculation"); see also Cal. Civ. Code § 1550 (recognizing that the "essential" elements of contract formation include mutual consent and sufficient consideration); see also Stockton Mortg., Inc. v. Tope, 233 Cal. App. 4th 437, 454 (2014) (holding that speculation about the creation of a separate agreement is not evidence of a contract).

In sum, the court finds no dispute of material fact that several contracts existed between JIB and Defendants, or that JIB performed its obligations under the terms of those contracts.

### ii. Defendants' Breach

Taken together, the Franchise and Lease Agreements required Defendants to (1) make monthly payments of rent, royalty fees, marketing fees, and other ancillary fees, (2) pay all taxes associated with operation of the restaurants, (3) pay all debts as they came became due in the regular course of business, (4) provide JIB with quarterly profit and loss statements and balance sheet within 20 days of the end of each quarter, and (5) comply with any other agreement between JIB and Defendants, including lease agreements and notes. Rand Decl., at Exs. 1, 4. The agreements also prohibited Defendants from encumbering or causing any claim or lien to be placed on a leased site location and from encumbering their franchise and leasehold rights without JIB's prior written consent. Id.

Here, the evidence shows that beginning in February, 2013, and continuing through at least the termination of the agreements in September, 2013, Defendants failed to observe their obligations under the Franchise and Lease Agreements. To that end, JIB established that Defendants failed to timely pay rent, royalty, marketing and other fees required by the Franchise Agreements, failed to pay taxes due on the restaurants' operations such that state and county tax liens were recorded, failed to provide quarterly profit and loss statements and balance sheets within the contractual timeframe, permitted MGI Group LLC to file a UCC Financing Statement against Defendants' property without JIB's consent, and failed to provide JIB with Coca-Cola rebate as required by the 2012 Note.

The evidence also shows that JIB issued several default notices to Defendants before

11

Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

finally terminating the agreements on September 17, 2013. Rand Decl., at Exs. 12-25. These notices permitted sufficient time for Defendants to cure the several defaults in accordance with the terms of the Franchise Agreements. Accordingly, the court finds that JIB has met its burden to establish that Defendants breached the agreements.

Importantly, Defendants do not dispute these instances of breach but raise a series of evidentiary objections and other miscellaneous theories. First, in their responsive separate statement,[3] Defendants object to JIB's recitations of provisions of the Franchise and Lease Agreements as legal conclusions. These objections are overruled because JIB's statements accurately reflect the terms of the agreements and are not legal conclusions. Second, Defendants object to the default notices as unauthenticated hearsay. The objections are also overruled. Under Federal Rule of Civil Procedure 901, an item of evidence can be authenticated through witness testimony "that an item is what it is claimed to be." Here, several witnesses, including Hobson, Michael Snider, Keith Guilbault and Connie Rand confirmed the default notices were authentic. And the default notices are not excludable as hearsay. As JIB points out, the notices are not offered for the truth of the factual assertions stated in the documents but have been submitted for the purpose of demonstrating that the notices were prepared and sent. See Fed. R. Evid. 801(c). Even if they were offered for the truth, Rand's declaration establishes they fall within the business records exception to hearsay. See Fed. R. Evid. 803(6).

Third, Defendants argue their breaches of the agreements were not material. This argument is unpersuasive. Because the primary purpose of the agreements was to provide JIB compensation and security in exchange for the use of its commercial marks, operating system and property, Defendants' undisputed breaches of the agreements were material. Super. Motels, Inc. v. Rinn Motor Hotels, Inc., 195 Cal. App. 3d 1032, 1051 (1987). A reasonable jury could not

---

[3] While the court will address the objections for the sake of completeness, it nonetheless observes that these objections were imposed in violation of § IV(D) the undersigned's Standing Order for Civil Cases, which requires that objections to evidence be contained within the objecting party's brief.

conclude otherwise on this record. See Anderson, 477 U.S. 248 (explaining that summary judgment should be denied only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Fourth, Defendants have not designated sufficient evidence to raise a triable factual issue regarding the enforceability of the 2012 Note and General Release. "[A] general release can be completely enforceable and act as a complete bar to all claims (known or unknown at the time of the release) despite protestations by one of the parties that he did not intend to release certain types of claims." San Diego Hospice v. Cnty. of San Diego, 31 Cal. App. 4th 1048, 1053 (1995). In addition, when the party to a general release is represented by counsel during its negotiation, it is presumed that counsel explained "the import of the release in general and of the waiver of section 1542 in particular" absent any evidence to the contrary." Salehi v. Surfside III Condo. Owners Assn., 200 Cal. App. 4th 1146, 1160 (2011). Unless "there is any evidence that the releasee has not dealt fairly with the releaser," the release is enforceable according to its terms. Dubois v. Sparrow, 92 Cal. App. 3d 290, 298 (1979).

The undisputed evidence shows that D. and K. Mehta were represented by counsel during the negotiations that culminated in the 2012 Note and General Release. McWhorter Decl., at Ex. 15, 97:18-98:13. The General Release itself states as much, and also states that D. and K. Mehta "made such investigation necessary and inquiry as they and Counsel have deemed appropriate, and that they understand said provisions and effect, and have executed this General Release of All Claims freely and without duress." Rand Decl., at ¶ 13, Exs. 9, 10. D. and K. Mehta have not produced evidence showing their counsel failed to explain the release, that the statements contained in the Note and General Release are untrue, or that Hobson's purported relationship with D. Mehta had any effect on the negotiations.

Fifth, the evidentiary record does not support a finding that JIB and Defendants agreed to a "delayed payment schedule" or consented to any encumbrances or liens. The only evidence in support of these alleged facts is K. Metha's declaration. But as with the purported "Cure Deal,"

this evidence is insufficient to permit a reasonable jury to find a contact modification, a waiver of JIB's rights under the agreements, or a separate contract.

Finally, there is no reason to address Defendants' argument under the so-called "prevention doctrine" because they did not produce sufficient evidence to establish the existence of a "Cure Deal."

Based on this discussion, the court finds no dispute of material fact that Defendants breached the Franchise and Lease Agreements.

### iii. JIB's Damages

JIB has produced evidence documenting the existence of unpaid royalties, marketing fees, rent and other fees owed as a result of Defendants' breach of the Franchise and Lease Agreements. Decl. of Douglas Gadd, Dkt. No. 205. In their opposition, Defendants offer no contrary evidence or argument on this element. Accordingly, the court finds that JIB has satisfied its burden to show the existence of damages.

Since JIB has produced undisputed, admissible evidence for each element of breach of contract, the motion for partial summary judgment as to liability will be granted.

### B. Trademark Infringement and Unfair Competition

JIB moves for summary judgment on its third and fourth causes of action for trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a)(1).

To prevail on the cause of action for trademark infringement claim under 15 U.S.C. § 1114, JIB "must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." Dep't of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006). In this case, an analysis of these factors will also apply to the cause of action for unfair competition under 15 U.S.C. § 1125(a)(1). Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1046 n.8 (9th Cir. 1999); Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988) ("The 'ultimate test'

14
Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

1   for unfair competition is exactly the same as for trademark infringement . . . .").

2   JIB has established the elements of statutory trademark infringement with admissible
3   evidence. As to the first element, the fact that JIB has registered its marks constitutes prima facie
4   evidence of their validity and of JIB's ownership interest in the marks. Guilbault Decl., at ¶ 8, Ex.
5   4; 15 U.S.C. § 1057(b); 15 U.S.C. § 1115(a). Defendants do not claim otherwise.

6   As to the second element, "[n]either actual confusion nor intent is necessary to a finding of
7   likelihood of confusion." Century 21, 846 F.2d at 1178. The Ninth Circuit has articulated eight
8   factors relevant to determining a likelihood of confusion, often referred to as the "Sleekcraft"
9   factors: strength of the mark, proximity of the goods, similarity of the marks, evidence of actual
10  confusion, marketing channels used, type of goods and the degree of care likely to be used by the
11  purchaser, defendant's intent in selecting the mark and likelihood of expansion of the product
12  lines. AMF v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). "The Sleekcraft factors are
13  not a scorecard, a bean-counter, or a checklist." Fortune Dynamic, Inc. v. Victoria's Secret Stores
14  Brand Mgmt., 618 F.3d 1025, 1031 (9th Cir. 2010). "Some factors are much more important than
15  others, and the relative importance of each individual factor will be case-specific." Brookfield
16  Communs., Inc., 174 F.3d at 1054.

17  Applying the relevant Sleekcraft factors here, the undisputed fact that Defendants
18  continued to use the Jack in the Box® marks after JIB terminated the franchise agreement as a
19  "holdover" franchisee is ultimately dispositive of the consumer confusion issue. Guilbault Decl.,
20  at ¶ 11. The evidence shows the Jack in the Box® marks are strong, "famous and distinctive." Id.
21  at ¶ 10; Century 21, 846 F.2d at 1179 ("Marks may be strengthened by extensive advertising,
22  length of time in business, public recognition, and uniqueness."). The marks at issue are identical
23  since Defendants carried on use of the same Jack in the Box® marks after the Franchise
24  Agreements were terminated. Id. at ¶ 11. The same is true of the marketing channels used and the
25  types of goods associated with JIB, on the one hand, and Defendants, on the other, since the
26  parties were both involved in the same restaurant services during the relevant time period. Id. at

15
Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT

¶¶ 11-13. In addition, it is reasonable to infer that Defendants intended to capitalize on the Jack in the Box® marks through impermissible use. Entrepreneur Media v. Smith, 279 F.3d 1135, 1148 (9th Cir. 2002) ("Where an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse."). All of these factors weigh in favor of finding a likelihood of consumer confusion.

Outside of arguments already rejected in relation to the breach of contract cause of action, Defendants do not point to any evidence establishing a disputed material fact as to trademark infringement or unfair competition. Accordingly, JIB's motion for summary judgment as to these causes of action will be granted.

### C.  Defendants' Counterclaims

JIB moves for summary judgment on Defendants' counterclaim for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and negligent interference with contract and economic advantage. Because it would be Defendants' burden to provide the counterclaim at trial, they must come forward with admissible evidence to show there is a genuine dispute for trial. Celotex Corp., 477 U.S. at 323-24.

With regard to the counterclaim for breach of contract, Defendants have not produced sufficient evidence to establish their performance or an excuse for non-performance under the agreements, or that JIB breached § 17(c)(10) of the Franchise Agreements. In fact, the record shows that Defendants breached the agreements as early as February, 2013 - several months before JIB's alleged breach in September, 2013. As such, Defendants cannot assert that JIB subsequently breached another provision of the same agreements or subsequently violated the implied covenant of good faith and fair dealing by allegedly preventing Defendants from curing their own default. Plotnik v. Meihaus, 208 Cal. App. 4th 1590, 1602 (2012) (holding that one who breaches a contract "cannot recover for a subsequent breach by the other party"); Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1369 (2010).

Defendants have also failed to support the counterclaim for promissory estoppel. The

elements of a promissory estoppel claim are (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the promisee; and (3) injury to the promise. US Ecology, Inc. v. State of California, 129 Cal. App. 4th 887, 901 (2005). For reasons already explained, the unsubstantiated "Cure Deal" cannot satisfy the first element of a promissory estoppel claim, and Defendants have not cited to any other evidence that JIB made "a clear and unambiguous promise" not to terminate the Franchise Agreements, oral or otherwise.

Furthermore, Defendants have not established a counterclaim for negligent interference with a contract or with a prospective economic advantage, which is essentially one tort. See SCEcorp v. Super. Ct., 3 Cal. App. 4th 673, 677 (1992). "[N]egligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." N. Am. Chemical Co. v. Super. Ct., 59 Cal. App. 4th 764, 787 (1997).

Here, Defendants have not produced evidence on which a reasonable jury could find that the $2.3 million payoff demand that JIB provided to Bank of America was negligently-prepared or constituted an inaccurate reflection of the amount owed by Defendants as of September 12, 2013. Indeed, the only evidence Defendants cite in support of their argument that JIB miscalculated the payoff demand is K. Mehta's statement that JIB failed to account for payments made in April, 2013. She believes that had they done so, "JIB would have paid down [Defendants'] franchise fees, and then looked for [Defendants] to pay down the 2012 Note . . . ." Decl. of K. Mehta, at ¶

37. That statement does not establish that JIB was negligent, however, because the evidence shows that JIB permissibly applied the payments to the 2012 Note under the Franchise Agreements, which empowered JIB with the "sole discretion" to apply any payments to any past due indebtedness. Rand Decl., at Ex. 1, § 7(E). Moreover, Defendants did not provide any evidence supporting the accuracy of D. Mehta's payoff requests to Hobson and Paul for $800,000 and $1 million, to the extent they rely on either of those figures as correctly representing the amount of their default on September 12, 2013.

Because JIB has successfully shown the absence of disputed material fact, the court will grant its motion for summary judgment on Defendants' counterclaim.

## IV. ORDER

Based on the foregoing:

1. JIB's motion for partial summary judgment on its cause of action for breach of contract is GRANTED.

2. JIB's motion for summary judgment on its causes of action for trademark infringement and unfair competition is GRANTED; and

3. JIB's motion for summary judgment on Defendants' counterclaim is GRANTED.

The Case Management Conference scheduled for June 23, 2016, is VACATED. Instead, the court schedules this action for a Trial Setting Conference at **11:00 a.m. on July 21, 2016**. The parties shall file a Joint Trial Setting Conference Statement on or before **July 11, 2016**. Counsel are advised that personal appearances will be required at the Trial Setting Conference; requests for telephonic appearance will not be granted and should not be submitted.

**IT IS SO ORDERED.**

Dated: June 21, 2016

EDWARD J. DAVILA
United States District Judge

18
Case No.: 5:13-cv-04444-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR SUMMARY JUDGMENT